**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
**The Honorable Michael E. Romero**

| | |
|---|---|
| In re:<br><br>Richard Joseph Gillit,<br><br>Debtors. | Case No. 25-12867 MER<br><br>Chapter 7 |
| Scott Robbins, Inc.,<br><br>Plaintiff,<br><br>v.<br><br>Richard Joseph Gillit,<br><br>Defendants. | Adversary Pr. No. 25-1316 MER |

## ORDER

THIS MATTER comes before the Court following a trial on the Plaintiff's claims alleging the Debtor-Defendant, Richard Gillit ("**Gillit**"), should be denied his discharge. The Plaintiff, Scott Robbins, Inc. ("**SRI**") argues that Gillit made various false oaths in his bankruptcy schedules.

## BACKGROUND

This dispute centers on a Farmers Insurance agency located in Castle Rock, Colorado. Prior to 2018, the agency was owned and operated by SRI and its owner, Mr. Scott Robbins ("**Robbins**"). In 2018, Gillit and Robbins began negotiations for the sale of the business to Gillit. Around that time, Gillit formed Rick Gillit Insurance Agency LLC ("**RGIA**"). Gillit is the sole owner of RGIA. The parties eventually executed a "Business Bill of Sale (Purchase Agreement)" (the "**Purchase Agreement**") dated August 30, 2018.[1] Under the Purchase Agreement, RGIA, as buyer, agreed to purchase the insurance business from SRI, as seller, for $800,000. At trial, the parties disputed who drafted the Purchase Agreement, but agreed that neither was represented by counsel.

The purchase included the agency's "portfolio" or "folio" of insurance policies as well as physical assets such as office furniture and the like. The "folio" is an agent's

[1] Ex. 25.

main asset and determines the amount of money that Farmers Insurance will pay to that agent on a monthly basis—the so-called "folio payment." The amount of folio payment varies from month to month and includes commissions owed for policy renewals, new policies, and residuals, as well as bonuses and other incentives.

Although RGIA was listed as the "buyer" under the Purchase Agreement, its exact role in the business is a matter of dispute. Both Robbins and Gillit testified that Farmers Insurance requires its agents to form a corporate entity, but neither could adequately explain why. In practice, RGIA had no apparent relationship with Farmers Insurance. The Agent Appointment Agreement that Gillit signed with Farmers appointed *Gillit* individually as its insurance agent, not RGIA.[2] Gillit also personally signed the "Sale of Service and Commission Rights Approval Agreement," in which Farmers approved the sale and transfer of Robbins' individual agency service and commission rights to Gillit, individually.[3] Neither party presented evidence of any contract between RGIA and Farmers Insurance or, indeed, that Farmers Insurance was even aware of RGIA's existence.

The agency's finances were also done in Gillit's individual name. For example, Gillit opened a business checking account (the "**Account**") in his individual name at Farmers Insurance Group Federal Credit Union ("**FIGFCU**")—a financial institution that is separate and distinct from Farmers Insurance.[4] Farmers Insurance deposited Gillit's monthly folio payments into the Account. Gillit also personally took out a loan from FIGFCU to pay a portion of the $800,000 purchase price owed to SRI.[5] The loan was secured by the folio payments Farmers Insurance pays to Gillit.[6] FIGFCU automatically deducts two required loan payments from the Account each month.

Gillit has operated the insurance agency since its purchase in 2018. In 2025, the agency's folio payment ranged between $18,000 and $31,000 per month.[7] Each year, Gillit reports the agency's yearly income on his personal tax returns.[8] That income has recently been in decline. Gillit testified that this is due to several factors, including the COVID pandemic, a heart attack he suffered in August 2024, and a decrease in the commissions paid by Farmers Insurance. As a result, Gillit failed to pay the entire purchase price owed to SRI. SRI and Robbins sued him and RGIA pre-petition in state

[2] Ex. 15. Gillit also personally signed the related "External Acquisition Contract Value Addendum to Agent Appointment Agreement." Ex. D.

[3] Ex. E.

[4] Ex. B (account statements).

[5] Ex. 17.

[6] *Id.* at 2.

[7] Ex. 2.

[8] Ex. 7 (tax return for 2023). Gillit testified that he has not yet filed taxes for 2024 or 2025.

court and ultimately obtained a judgment for $1.5 million. Gillit filed for bankruptcy on May 1, 2025.

During his bankruptcy case, Gillit has been inconsistent about whether the agency's assets are his personally, or belong to RGIA. On Schedule A/B, he listed his ownership of the Account and his interest in RGIA (valued at $0). However, he did not list the folio as an asset. On his Schedule I, he did not list the agency's gross income or deduct business expenses, as the form requires. Instead, he listed $10,000 as his monthly "gross wages, salary and commissions (before payroll deductions)."[9] On his Statement of Financial Affairs ("**SOFA**"), Gillit listed net income received from the business, rather than gross income, as the form specifies.[10]

At a Rule 2004 examination conducted by Robbins on October 17, 2025, Gillit maintained that he was not personally an agent for Farmers Insurance, but that RGIA was the agent. He also testified that RGIA owned Account and received commissions from the folio. Gillit stated that he only received money from RGIA.

At trial, Gillit disavowed much of his Rule 2004 testimony. Instead, he testified that he is personally Farmers' agent, that he owns the Account, and that the folio payments received in that Account are his personal funds. He also testified that the folio is his personal asset, even though he did not list it on Schedule A/B because he was allegedly confused about RGIA's role. That confusion also allegedly led him to omit from the SOFA loan payments he made to FIGFCU in the 90 days before the petition date. He disclaims any fraudulent intent in listing his net income rather than gross income on his schedules. He claims to have filled out his schedules to the best of his ability and knowledge on the petition date, while conceding his understanding of RGIA's role has changed over time. Gillit further acknowledges he failed to properly list FIGFCU as a creditor on his schedules, but blames that omission on a faulty address listed in his credit report.

SRI's Complaint in this adversary proceeding alleges claims for denial of discharge under 11 U.S.C. § 727(a)(4) and (a)(2).[11] SRI also objected to Gillit's claim of exemption in the Account. The Court consolidated the § 727 claims and the exemption objection for purposes of trial.

## ANALYSIS

### A. § 727(a)(4)

Section 727(a)(4)(A) provides that a debtor will be denied a discharge if he knowingly and fraudulently made a "false oath" in or in connection with the case.

[9] Ex. 6, at 35 (Schedule I, line 2).

[10] *Id.* at 9 (SOFA, Question 4).

[11] All references to "section" or "§" shall refer to Title 11, United States Code, unless expressly stated otherwise.

Because a debtor signs his bankruptcy schedules and the SOFA under penalty of perjury, an omission of information from those schedules or SOFA can constitute a false oath under § 727(a)(4)(A).[12] "To trigger section 727(a)(4)(A), the false oath must relate to a material matter and must be made willfully with intent to defraud."[13] The subject matter of a false oath is "material," if it "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property."[14] As for the intent element, it is not enough for the objecting party to merely point to inaccuracies and inconsistencies in a debtor's schedules.[15] Rather, "[t]o deny the Debtor a discharge under § 727(a)(4)(A), the Court must be able to find that the Debtor intended to defraud and mislead the other parties in the case."[16] In some instances, a reckless indifference to the truth may give rise to an inference of fraud for purposes of § 727(a)(4)(A). However, a debtor will not be denied discharge if the false statement was due to mere mistake or inadvertence or the result of an honest error or mere inaccuracy.[17] SRI bears the burden of proof to prove a false oath under § 727(a)(4).[18] "Once the plaintiff has met its burden of presenting prima facie evidence going to each of the elements of its case, thereby raising a reasonable inference of the debtor's intentional fraud, the burden shifts to the debtor to provide a cogent explanation for the omissions or misstatements."[19]

In this case, SRI's false oath assertions relate to three items: (i) Gillit's failure to list the folio as an asset; (ii) his failure to list his gross income on Schedule I and the SOFA; and (iii) failure to accurately list FIGFCU as a creditor on Schedule D and to list on the SOFA the loan payments he made to FIGFCU in the ninety days prepetition. SRI argues these omissions along with Gillit's flip-flopping on ownership of the folio and the Account demonstrates that Gillit's goal was simply to prevent SRI from collecting on its judgment.

The Court agrees that these omissions show, at best, a reckless indifference towards accuracy and disclosure, and at worst a specific intent to disguise the truth. The folio is Gillit's most important asset as it is the source of all his income. He admits his schedules fail to list the asset, yet he made no amendments to his schedules to include it. That omission is exacerbated by Gillit's failure to accurately list his income on

[12] *Job v. Calder (In re Calder)*, 907 F.2d 953, 955 (10th Cir. 1990).

[13] *Id.*

[14] *McVay v. Phouminh (In re Phouminh)*, 339 B.R. 231, 243 (Bankr. D. Colo. 2005).

[15] *Id.* at 242.

[16] *Id.*

[17] *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1295 (10th Cir. 1997).

[18] Fed. R. Bankr. P. 4005.

[19] *In re Phouminh*, 339 B.R. at 242.

either Schedule I or the SOFA. Both require a debtor to list *gross* income.[20] Schedule I requires a debtor who owns a business to show both gross and net business income by attaching a statement for the business "showing gross receipts, ordinary and necessary business expenses, and the total monthly net income."[21] Gillit failed to do this, merely listing $10,000 as his gross wages and omitting any mention of income from a business. Had Gillit accurately listed his income, it would have shown the gross folio payments he receives from Farmers Insurance, along with the deductions he makes for various business expenses and his resulting actual net income. Without that information, parties in interest were left in the dark about the true source income, as well as how Gillit arrived at the $10,000 figure.

Although Gillit claims his failure to list the folio and his gross income was due to a simple misunderstanding, the Court did not find this explanation credible. Instead, it appears Gillit was purposefully changing his story. His bankruptcy schedules tell one story by listing a membership interest in RGIA and ownership of the Account but omitting any mention of the folio or a calculation of his gross income. That story changed when SRI deposed Gillit pursuant to Rule 2004. There, he testified that RIGA owned the folio and that RIGA paid him salary. At trial, his testimony changed again, admitting both the Account and the folio were his personal assets and that he, not RIGA, received the folio payments. An accurate calculation of Gillit's income was only shown through cross examination on the stand. To the Court, Gillit's changing story shows a debtor attempting to shield his assets or, at the very least, a debtor intentionally creating confusion about the ownership of his assets.

Gillit argues the omission of the folio is inconsequential because it is encumbered by a lien held by FIGFCU and thus has no value to unsecured creditors such as SRI. However, the case law is clear that complete honesty and transparency are required in listing assets, no matter the value of those assets.[22] A debtor cannot omit an asset simply because he or she believes it has no value.[23] Similarly, although a debtor's income is not something that directly affects creditor recovery in a chapter 7 case, it is nevertheless relevant to a Debtor's financial situation and, for that reason, is considered "material" for purposes of § 727(a)(4).[24]

To further add to the confusion, Gillit also failed to accurately schedule FIGFCU as a secured creditor on Schedule D and to list on his SOFA the loan payments he made to FIGFCU in the ninety days leading up to the petition date. Gillit blames the omission of FIGFCU on the credit report his counsel obtained prior to filing bankruptcy.

---

[20] Ex. 6, at 8-9 (SOFA, question 4); 36 (Schedule I, question 8).

[21] *Id.* at 36 (Schedule I, question 8a).

[22] *Job v. Calder (In re Calder)*, 907 F.2d 953, 955 (10th Cir.1990).

[23] *In re Calder*, 907 F.2d at 955; *The Cadle Co. v. King (In re King)*, 272 B.R. 281, 300 (Bankr. N.D. Okla. 2002); *May v. Jamison (In re Jamison)*, 329 B.R. 743, 752 (Bankr. D. Kan. 2005).

[24] See *McVay v. Phouminh (In re Phouminh)*, 339 B.R. 231, 243 (Bankr. D. Colo. 2005).

That credit report accurately lists the loan debt he owes to FIGFCU and lists FIGFCU's address in Burbank, California. However, for reasons that are unclear, the report also lists a "Bankruptcy-Specific Address" for FIGFCU as "OnPath Federal CU Attn: Bankruptcy Dept, 3076 Lancaster Drive NE, Salem, OR 97305."[25] Based on this information, Gillit listed OnPath Federal CU ("**OnPath**") as an unsecured creditor on Schedule F, not FIGFCU.[26] All bankruptcy-related notices have therefore been mailed to OnPath rather than FIGFCU. Gillit testified that he did not know whether OnPath is an agent for FIGFCU, and he could not verify whether FIGFCU received notice of the bankruptcy case. Gillit testified he has not communicated with FIGFCU post-petition about the filing.

While the credit report may have caused confusion about FIGFCU's address, Gillit could have eliminated most of that confusion by researching the address before listing it, adding FIGFCU's name along with OnPath's, or listing more than one address for FIGFCU. At the very least, he should have listed OnPath/FIGFCU as a *secured* creditor on Schedule D with a notation of FIGFCU's security (the folio) rather than an unsecured creditor on Schedule F. It might seem that the omission of FIGFCU's debt from the schedules was immaterial given that FIGFCU will retain its lien regardless of Gillit's bankruptcy filing. That fact, however, does not excuse Gillit from using his best efforts to list all creditors accurately.[27]

Furthermore, Gillit wholly failed to explain how the credit report's listing of OnPath caused him to omit the loan payments he made to FIGFCU on his SOFA. The SOFA requires a debtor to list creditors to whom the debtor made payments in the 90 days before the petition date.[28] Gillit admitted at trial that FIGFCU deducts the same two loan payments, totaling approximately $5,566 per month, from his Account every month.[29] Yet, Gillit did not list those loan payments on his SOFA. Ultimately, this omission will not adversely affect creditors because it is unlikely the loan payments would be recoverable as preferences under § 547.[30] That fact, however, does not negate Gillit's responsibility to fill out his SOFA accurately.

---

[25] Ex. F. at 4.

[26] Ex. 6, at 30 (Schedule F, ¶¶ 4.5-4.6).

[27] *See Skavysh v Katsman (In re Katsman)*, 771 F.3d 1048, 1050-51 (7th Cir. 2014) (finding debtor's deceptive omission of unsecured creditors from Schedule F to be material); *A.V. Reilly Int'l, Ltd. v. Rosenzweig (In re Rosenzweig)*, 239 B.R. 905, 910 (Bankr. N.D. Ill. 1999) ("The Court disagrees with the Debtor's argument that the failure to schedule a debt does not equate with the failure to schedule an asset. Debtors must make full disclosure of all assets and liabilities on their schedules.").

[28] Ex. 6, at 9 (SOFA, Question 6).

[29] *See* Ex. 3 (bank statement).

[30] *See Castletons, Inc. v. Zions First Nat'l Bank (In re Castletons, Inc.)*, 990 F.2d 551, 554 (10th Cir. 1993) ("[P]ayments to a fully secured creditor will not be considered preferential because the creditor would not receive more than in a chapter 7 liquidation." (citing 4 *Collier on Bankruptcy* ¶ 547.08, at 547–43 (Lawrence P. King ed., 15th ed. 1993)).

Based on all of these circumstances, the Court concludes that Gillit's false oaths were made fraudulently or with such reckless indifference to the truth as to warrant denial of his discharge.[31] Although Gillit claims he does not have much business experience, he did not strike the Court as unsophisticated in business matters. He has had almost eight years' experience running his insurance agency. He had the assistance of competent counsel in preparing his schedules and SOFA, yet still could not keep his stories straight. When he filed for bankruptcy, SRI was attempting to collect on its judgment. This led Gillit to characterize the folio, folio payments, and the Account in various ways to serve his interests at the moment. The Court finds this equivocation unacceptable. As one court put it "[o]ur bankruptcy system cannot function if debtors are permitted to decide for themselves which assets and liabilities to disclose in their filing papers and which ones to exclude."[32]

**B. § 727(a)(2)**

SRI's other claim seeks to deny Gillit his discharge pursuant to § 727(a)(2). The elements of a claim under that section are: (1) the debtor transferred, removed, concealed, destroyed, or mutilated, (2) property of the estate, (3) within one year prior to the bankruptcy filing or after the petition date, (4) with the intent to hinder, delay, or defraud a creditor or officer of the estate.[33] A claim under § 727(a)(2) requires a finding of actual intent to defraud a creditor or officer of the estate.[34] Timing is important under § 727(a)(2) because it sets time parameters for the alleged fraud. Subsection (A) denies discharge if the debtor transferred or concealed property in the year prior to the petition date, whereas subsection (B) applies to property transferred or concealed after the petition date. A debtor's failure to disclose assets and other pertinent information on his or her schedules can serve as the basis for a § 727(a)(2)(B) claim.[35]

In this case, SRI's § 727(a)(2) claim is based on Gillit's alleged post-petition concealment of assets. Specifically, SRI argues Gillit's failure to list the folio as an asset on Schedule A/B amounts to a post-petition fraudulent concealment of assets. SRI's Complaint also alleges Gillit fraudulently concealed assets by failing to list on his SOFA the loan payments he made to FIGFCU in the 90 days prior to the petition date. For the reasons stated above, the Court concludes these omissions amount to

---

[31] *The Cadle Co. v. King (In re King)*, 272 B.R. 281, 303 (Bankr. N.D. Okla. 2002) ("Whether his conduct resulted from actual intent to defraud his creditors or from a reckless indifference to the truth the result is the same; the Court, the trustee, and creditors were deprived of information at the outset of this case that they were entitled to have.").

[32] *Id*.

[33] *Gullickson v. Brown* (*In re Brown)*, 108 F.3d 1290, 1293 (10th Cir. 1997).

[34] *Ote v. Warren (In re Warren)*, 512 F.3d 1241, 1249 (10th Cir. 2008).

[35] *PNC Bank, N.A. v. Leongas (In re Leongas)*, 628 B.R. 71, 92 (Bankr. N.D. Ill. 2021); *Siegel v. Welson (In re Weldon)*, 184 B.R. 710, 713 (Bankr. D.S.C. 1995); *In re Bramhall*, 332 B.R. 182 (2005); *Montedonico v. Beckham (In re Beckham)*, 2009 WL 1726526 at *8 (6th Cir. BAP June 19, 2009).

concealment of assets with the intent to defraud creditors, and in particular SRI. Accordingly, Gillit's discharge is also denied pursuant to § 727(a)(2)(B).

**C. Exemption Objection**

On Schedule C, Gillit claimed two exemptions for funds in the Account. The first is under Colo. Rev. Stat. § 13-54-104, which generally permits a debtor to claim an exemption for up to 80% of his or her disposable "earnings."[36] The second exemption is under Colo. Rev. Stat. § 13-54-102(1)(w), which allows an exemption for up to $2,500 in a depository account in the name of the debtor. SRI objects to these exemptions on the grounds that the funds deposited in the Account are allegedly business revenue rather than Gillit's personal earnings and/or because Gillit has no personal ownership of the Account. However, SRI fails to back up this argument with any evidence.

As discussed above, Gillit listed the Account as his property on his Schedule A/B. The bank statements admitted at trial show that the Account was and is held in Gillit's name individually, not RGIA's. No evidence was presented showing that RIGA ever owned the Account. "Deposits in a bank to the credit of a bankruptcy debtor [are presumed] to belong to the entity in whose name the account is established."[37] Thus, Gillit is entitled to claim an exemption under Colo. Rev. Stat. § 13-54-102(1)(w) for $2,500 of the amount deposited in the Account on the petition date.

The evidence also supports a conclusion that amounts deposited in the account qualify as "earnings" under Colo. Rev. Stat. § 13-54-104. That section defines "earnings" as: "Compensation paid or payable to an individual employee or independent contractor for personal labor or services."[38] At least two bankruptcy courts in this district have determined that insurance commissions earned by a debtor-insurance agent constitute "earnings" under this statute.[39] Statements admitted at trial show the folio payments deposited into the Account consist primarily of commissions on policies along with some bonuses and other prizes paid by Farmers.[40] Robbins and Gillit also both testified that the folio payments are primarily commissions paid on policies sold or renewed. Based on this evidence, the Court concludes the folio payments are commissions earned by Gillit that meet the definition of "earnings" under the Colorado wage exemption statute.

---

[36] Colo. Rev. Stat. § 13-54-104(2)(a)(I)(A).

[37] *In re Amdura Corp*., 75 F.3d 1447, 1451 (10th Cir. 1996).

[38] Colo. Rev. Stat. § 13-54-104(1)(b)(I)(A).

[39] *In re Marshburn*, 5 B.R. 711, 714-15 (Bankr. D. Colo. 1980) (holding that "termination payments" debtor received as agent for State Farm Insurance were earnings because they were commissions for renewal premiums based on his personal services); *In re Fuchs*, 189 B.R. 811, 815 (Bankr. Colo. 1995) (holding that future commissions debtor earned based on renewal of insurance policies were "earnings").

[40] Exs. 1, 2.

To the extent SRI is arguing that the folio payments Farmers Insurance deposited into the Account belonged to RGIA and not Gillit, the evidence does not support that contention. The Court acknowledges that Gillit has taken inconsistent positions on ownership of the folio. However, all of the operative contracts admitted at trial are between Farmers Insurance and Gillit individually, not RGIA.[41] In particular, the Agent Appointment Agreement appoints Gillit, not RGIA, as the Farmers Insurance agent, and that contract gives Gillit, not RGIA, the contractual right to receive commissions from Farmers Insurance.[42] Similarly, the Sales of Service and Commission Rights Approval Agreement signed by Gillit, Robbins and Farmers, gives Gillit (not RGIA) the right to receive all of Robbins' commission rights. It is true that RGIA, not Gillit, signed the Purchase Agreement with SRI. However, Farmers is not a party to that contract, and it does not directly address nor control Gillit's right to receive commissions from Farmers Insurance. As discussed above, there is no evidence Farmers Insurance required or even knew of RGIA's existence.

Accordingly, the Court concludes Gillit is entitled to claim both the earnings exemption for 80% of the funds in the Account on the petition date as well as the deposit account exemption for $2,500 under Colo. Rev. Stat. § 13-54-102(1)(w).

**CONCLUSION**

For the foregoing reasons, the Court denies Gillit a discharge under § 727(a)(4) and 727(a)(2). SRI's objection to Gillit's claim of exemption in the Account is OVERRULED.

Dated: September 30, 2026.

BY THE COURT:

Michael E. Romero, Judge
United States Bankruptcy Court

---

[41] Exs. C, D, E.

[42] Ex. E, ¶ A1.